Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Joshua D. Smith, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

|  |  |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY COMPANY, | Docket No.:_____ (      ) |
| Plaintiffs, | **Plaintiff Demands a Trial by Jury** |
| -against- |  |
| PAPILLON EQUIPMENT INC., LAMENT SUPPLY GROUP INC., EUGENE KOGAN, ERIC AKOPYAN, DEAN RUCHIR SARDJOE, and JOHN DOE DEFENDANTS "1" THROUGH "10", |  |
| Defendants. |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Papillon Equipment, Inc., Lament

Supply Group Inc., Eugene Kogan, Eric Akopyan, Dean Ruchir Sardjoe, and John Doe Defendants

"1" through "10" (collectively, the "Defendants"), hereby allege as follows:

## **NATURE OF THE ACTION**

1.      This action seeks to recover more than $390,000.00 that the Defendants Papillon Equipment, Inc. ("Papillon Equipment"), Lament Supply Group Inc. ("Lament Supply"), Eugene Kogan ("Kogan"), Eric Akopyan ("Akopyan"), and Dean Ruchir Sardjoe ("Sardjoe") have wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent and inflated No-fault insurance charges relating to medically unnecessary durable medical equipment, which was dispensed, or allegedly dispensed, in predetermined protocol fashion to individuals who were involved in automobile accidents, without regard for genuine patient care.

2.      Papillon Equipment and Lament Supply are ostensibly separately owned companies; however, Kogan, Akopyan, and Sardjoe, in concert with John Doe Defendants "1" through "10", used these companies as part of an integrated scheme to exploit New York's No-fault insurance system by colluding with the operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "Clinics") and various physicians, chiropractors, and other healthcare providers (the "Referring Providers") to steer prescriptions, or purported prescriptions, for unnecessary durable medical equipment ("DME") (e.g., lumbar cushions, lumbar orthoses, and water circulating heating pads) to Papillon Equipment and Lament Supply.  The Defendants then purported to dispense the unnecessary DME to individuals who were eligible for insurance coverage under GEICO automobile insurance policies (the "Insureds") and inflated the charges to maximize profits.

3.      Papillon Equipment is owned on paper by Akopyan. Lament Supply is owned on paper by Sardjoe.  While Papillon Equipment and Lament Supply purport to be separate, legitimate retail medical supply companies, in fact, each had no actual retail operations, sold no DME to the

2

general public, concealed their telephone numbers and other contact information, and operated only as part of a fraudulent scheme before shutting down their active operations once GEICO began to investigate them.

4.     Papillon Equipment, Lament Supply, Kogan, Akopyan, and Sardjoe (collectively, the "DME Defendants") submitted more than $940,000.00 in fraudulent billing to GEICO, beginning in June 2022.  The submission of fraudulent No-fault insurance charges under the names of Papillon Equipment and Lament Supply followed on the heels of an April 2022 settlement agreement reached with Defendant Kogan in Government Employees Insurance Company, et al., v. Geneva Supply Group, Inc., et al., Docket No. 1:22-cv-00344-MKB-RER.  Kogan, undeterred by GEICO's affirmative fraud litigation regarding his involvement with Geneva Supply Group, conspired with Defendants Akopyan and Sardjoe to have them falsely hold themselves out as the sole owners of Papillon Equipment and Lament Supply, respectively, in order to disguise Kogan's involvement with those companies and his participation in yet another scheme to defraud GEICO and other New York automobile insurers.

5.     By this action, GEICO seeks to recover more than $390,000.00 that has been wrongfully obtained by the DME Defendants, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $283,000.00 in pending no-fault insurance claims that have been submitted through Papillon Equipment and Lament Supply because:

(i)     The DME Defendants billed for Fraudulent Equipment that were not medically necessary and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)    The DME Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful, collusive, kickback and financial arrangements; and

(iii)   To the extent that any Fraudulent Equipment was provided to the Insureds,

the bills for Fraudulent Equipment submitted to GEICO by the DME Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to insureds as the HCPCS Codes identified in the bills did not accurately represent what was provided to Insureds.

6.     The Defendants fall into the following categories:

(i)     Defendants Papillon Equipment and Lament Supply (the "DME Retailers") are New York corporations that purport to dispense Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and bills New York automobile insurance companies, including GEICO.

(ii)    Defendant Kogan is an individual who has no record ownership of the DME Retailers but participates in the operation, control, and ownership of Papillon Equipment and Lament Supply, with Akopyan and Sardjoe, and uses the corporations to submit bills to GEICO and other New York automobile insurance companies for purportedly dispensing Fraudulent Equipment to automobile accident victims.

(iii)   Defendants Akopyan and Sardjoe are the record owners of Papillon Equipment and Lament Supply, respectively, and conspired with Kogan to use the corporations to submit bills to GEICO and other New York automobile insurance companies for purportedly dispensing Fraudulent Equipment to automobile accident victims.

(iv)    John Doe Defendants "1" through "10" are citizens of New York and include the Clinic Controllers, who are presently not identifiable but who are not licensed healthcare professionals yet are associated with the Clinics and conspired with the DME Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

7.     As discussed below, the Defendants, at all times, have known that the claims for Fraudulent Equipment submitted to GEICO by the DME Defendants were fraudulent because: (i) the DME Retailers billed for Fraudulent Equipment that were not medically necessary and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;  (ii) the prescriptions directed to the DME Retailers were the byproducts of unlawful, collusive financial and/or kickback arrangements, and thus, the DME Retailers were not eligible for no-fault insurance reimbursement

in the first instance; (iii) the charges intentionally contained HCPCS Codes that misrepresented the type and nature of the Fraudulent Equipment actually provided to Insureds; and (iv) the charges were intentionally inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws.

8.     As such, the DME Defendants do not now have – and never had – any right to be compensated for their claims for Fraudulent Equipment.

9.     The charts attached hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims that have been identified to date that the DME Defendants submitted, or caused to be submitted, to GEICO through Papillon Equipment and Lament Supply.

10.     The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry has continued uninterrupted through the present day.  As a result of the Defendants' scheme, GEICO has incurred damages of more than $390,000.00.

## THE PARTIES

### I.     Plaintiffs

11.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal place of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.     Defendants

12.     Defendant Papillon Equipment is a New York corporation that was incorporated on or about June 20, 2022, and has its principal place of business in Brooklyn, New York.

13.     Defendant Lament Supply is a New York corporation that was incorporated on or

about October 14, 2022, and has its principal place of business in Brooklyn, New York.

14.     Defendant Kogan is a citizen of Florida and at all relevant times, has participated in the operation, control, and ownership of Papillon Equipment and Lament Supply, with Akopyan and Sardjoe, and uses the corporations to submit bills to GEICO and other New York automobile insurance companies for purportedly dispensing Fraudulent Equipment to automobile accident victims.

15.     Defendant Akopyan is a citizen of Florida and at all relevant times, has purported to be the sole record owner of Papillon Equipment. In actuality, Akopyan conspired with Kogan to hide Kogan's participation in the ownership, operation, and control of Papillon Equipment.

16.     Defendant Sardjoe is a citizen of Florida and at all relevant times, has purported to be the sole record owner of Lament Supply. In actuality, Sardjoe conspired with Kogan to hide Kogan's participation in the ownership, operation, and control of Lament Supply.

17.     John Doe Defendants 1-10 are citizens of New York and include the Clinic Controllers, who are presently not identifiable but who are not licensed healthcare professionals yet are associated with the Clinics and conspired with the DME Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

19.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

20.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

22.     GEICO underwrites automobile insurance in the State of New York.

**I.      An Overview of the Pertinent Laws**

**A.      Pertinent Laws Governing No-Fault Insurance Reimbursement**

23.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

24.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

25.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD.  See N.Y. Ins. Law § 5102(a).

26.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

27.     Pursuant to the No-Fault Laws, healthcare services providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing

7

requirements necessary to provide the underlying services.

28.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

29.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD.  <u>See</u>, <u>e.g.</u>, N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

30.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party." <u>See</u> N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

31.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co</u>., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

32.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services,

using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

33.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

34.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

35.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME and OD**

36.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME and OD that were provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME and OD that were provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under

No-Fault.

37.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes.  For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), thermophores (electrical moist heating pads), cervical traction units, and whirlpool baths.

38.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs.  These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee orthotics, ankle supports, wrist braces, and the like.

39.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the New York Fee Schedule sets forth maximum charges that may be submitted by healthcare providers for DME and OD.

40.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

41.     As it relates to charges for dispensing DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such

equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

42.     As it relates to charges for renting DME, the New York Fee Schedule sets forth the maximum charges as follows:

[t]he maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office.  The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule.

See 12 N.Y.C.R.R. § 442.2(b)

43.     Moreover, regarding delivery fees, the New York Fee Schedule sets forth as follows:

[t]he maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery.

See 12 N.Y.C.R.R. § 442.2(c) (emphasis added).

44.     As indicated by the New York Fee Schedule, payment for DME is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid Fee Schedule").

45.     According to the Medicaid Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in the Medicaid Fee Schedule. Alternatively, where a specific DME or OD is not identified in the Medicaid Fee Schedule ("Non-Fee Schedule item")

then the fee payable by an insurer to the provider shall be the <u>lesser</u> of: (i) 150% of the acquisition cost to the provider; <u>or</u> (ii) the usual and customary price charged to the general public.

46. For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

47. The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its <u>Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines</u> ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

48. As indicated by the New York Fee Schedule, the total monthly rental cost for Fee-Schedule items shall not exceed the <u>lower</u> of: (i) the monthly rental charge to the general public' or (ii) the monthly fee permitted under the Medicaid Fee Schedule.

49. Under the Medicaid Fee Schedule, the total monthly rental charge for equipment, supplies, and services of Fee Schedule items is 10% of the maximum reimbursement amount.

50. However, when DME is rented and charged to automobile insurers using HCPCS codes that are recognized by the Medicaid Fee Schedule but do not contain a maximum reimbursement amount the maximum charge for a monthly rental is 10% of the acquisition cost for the DME. <u>See</u> <u>New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines</u>, p. 16; <u>Gov't Emples. Ins. Co. v. MII Supply LLC</u>, Index No. 616953/18, Docket No.

43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019) (applying the 10% of acquisition cost rule for DME rentals within the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines to No-Fault reimbursement for HCPCS Codes that are recognized by the Medicaid Fee Schedule but do not contain a reimbursement amount).

51.     For charges related to rental cost of Non-Fee Schedule items, the maximum monthly rental cost, as per the New York Fee Schedule, is the monthly cost to the general public because the New York State Department of Health has not established a price for DME rentals and defers as a matter of policy to the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines.

52.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either an NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The DME or OD is based upon a legitimate prescription by a healthcare practitioner that is licensed to issue such prescriptions, and for a reasonable and medically necessary item;

(ii)    The prescription for DME or OD was not issued pursuant to any unlawful financial arrangements;

(iii)   The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)     The fee sought for the DME or OD was not in excess of the maximum amount permitted by law.

II.     **The Geneva Supply Litigation and the Antecedents of the Defendants' Fraudulent Scheme**

53.     In January 2022, GEICO sued Kogan and Geneva Supply Group, Inc. ("Geneva Supply") in an action entitled *Government Employees Insurance Company, et al., v. Geneva Supply Group, Inc., et al.*, Docket No. 1:22-cv-00344-MKB-RER (the "Geneva Supply Litigation").

54.     In the Geneva Supply Litigation -- much as in the present case -- GEICO alleged, among other things, that Kogan devised a scheme to obtain prescriptions from various healthcare providers in order to submit large volumes of billing through Geneva Supply to GEICO and other New York automobile insurance companies for providing Fraudulent Equipment that was medically unnecessary, illusory, and otherwise not reimbursable.

55.     Shortly after discovery commenced in the Geneva Supply Litigation, Kogan and Geneva Supply entered into a confidential settlement agreement with GEICO.  The confidential settlement agreement nevertheless allows disclosure of an Affidavit signed by Kogan wherein he withdrew, with prejudice, all bills, claims, lawsuits, arbitrations and other proceedings in the name of Geneva Supply seeking payment from GEICO and warranted that Geneva Supply would not submit any future bills to GEICO.

III.    **The Defendants' Fraudulent Scheme**

56.     Following the execution of the settlement agreement in the Geneva Supply Litigation in late-April 2022, the Defendants implemented a new, complex fraudulent scheme to exploit the New York No-fault insurance system, involving fraudulent billing for largely the same type of DME previously dispensed by Geneva Supply.

57.     The DME Defendants initiated the scheme by having Akopyan purport to be the sole owner of a new DME retailer, Papillon Equipment, that would be used as a vehicle to bill

14

GEICO and other New York automobile insurers for No-Fault Benefits that they were never entitled to receive.

58.     In actuality, at all relevant times, Kogan – at least in part – owned, controlled, and maintained a financial interest in Papillon Equipment, despite not being an owner of record, in order to conceal his continued exploitation of the New York no-fault insurance system and to undermine the settlement agreement reached in the Geneva Supply Litigation.

59.     In keeping with Kogan's participation in the ownership and control of Papillon Equipment, Papillon Equipment was formed on June 20, 2022, less than two months after the settlement in the Geneva Supply litigation.

60.     In further keeping with Kogan's participation in the ownership and control of Papillon Equipment, it was Kogan – not Akopyan – that paid for Papillon Equipment's New York City Department of Consumer and Worker Protection ("DCWP") license, which is required for a medical supply company to operate in the New York City area.

61.     During the time period it operated, Papillon Equipment submitted billing for largely the same type of DME previously dispensed by Geneva Supply, received referrals from many of the same prescribing physicians, and utilized the same billing protocols.

61.     During the time period it operated, Papillon Equipment maintained no actual retail operations, sold no DME to the general public, concealed its telephone number and other contact information, and operated only as part of a fraudulent scheme before shutting down active operations once GEICO began to investigate it.

62.     Following multiple requests for an examination under oath ("EUO") of Papillon Equipment by GEICO, Papillon Equipment abruptly ceased billing in October 2022.

63.     Lament Supply was incorporated on October 14, 2022 and began submitting billing

to GEICO shortly thereafter.

64.     Despite Sardjoe's record sole ownership of Lament Supply, it was Akopyan – not Sardjoe – that paid for Lament Supply's DCWP license. In actuality, just as with Papillon Equipment, Kogan participated in the ownership and control of Lament Supply.

65.     In keeping with Kogan's continued control over the fraudulent DME scheme, during the time period it operated, Lament Supply submitted billing for largely the same type of DME previously dispensed by Geneva Supply and Papillon Equipment, received referrals from many of the same prescribing physicians, and utilized the same billing protocols.

65.     During the time period it operated, Lament Supply maintained no actual retail operations, sold no DME to the general public, concealed its telephone number and other contact information, and operated only as part of a fraudulent scheme before shutting down active operations once GEICO began to investigate it.

65      Following multiple requests for an EUO of Lament Supply by GEICO, Papillon Equipment abruptly ceased billing in March 2023.

66.     In keeping with the fact that the Geneva Supply, Papillon Equipment, and Lament Supply were all part of the same fraudulent scheme, Akopyan and Sardjoe were business associates prior to the formation of Papillon Equipment or Lament Supply, with shared financial interests in at least one Florida corporation.

67.     Furthermore, despite purporting to own and operate Papillon Equipment and Lament Supply, Akopyan and Sardjoe both resided, at all relevant times herein, in Florida, i.e., not New York where the DME Retailers operated.

68.     To date, the DME Defendants have wrongfully obtained more than $390,000.00 voluntarily from GEICO, and there is more than $283,000.00 in additional fraudulent claims that

have yet to be adjudicated, but which the DME Defendants continue to seek payment of from GEICO.

A.      **Overview of the Defendants' Fraudulent Scheme**

1.  **The Defendant's Fraudulent Equipment Scheme**

69.     Between 2022 and present day, the DME Defendants submitted more than $940,000.00 in fraudulent claims to GEICO through Papillon Equipment and Lament Supply seeking reimbursement for Fraudulent Equipment. To date, the DME Defendants have wrongfully obtained more than $390,000.00 from GEICO, and there is more than $283,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the DME Defendants continue to seek payment of from GEICO.

70.     Kogan, Akopyan, and Sardjoe used Papillon Equipment and Lament Supply to directly obtain No-Fault Benefits and maximize the amount of No-Fault Benefits they could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for Fee Schedule and Non-Fee Schedule items that were not medically necessary and were provided pursuant to predetermined fraudulent protocols.

71.     While Papillon Equipment and Lament Supply operated as ostensibly separate companies, they were used as part of an integrated scheme, with each largely dispensing the same Fraudulent Equipment, each operating in the same manner, each lacking any accessible retail location, each operating without advertising or marketing to the general public or without making any legitimate efforts to attract patients or customers who might need DME, each using a similar file tracking system (*ie.*, File #) located on the bottom right corner of their delivery receipts, and each submitting similar billing documentation that contained blanks where the companies' telephone and fax numbers were referenced.

71.     The DME Defendants were able to perpetrate the fraudulent scheme against GEICO described by obtaining prescriptions, or purported prescriptions, for Fraudulent Equipment purportedly issued by the Referring Providers because of secret kickback agreements with third-party individuals who are not presently identifiable.

72.     As part of the scheme, and in a way to maximize the amount of money that the DME Defendants could obtain from GEICO and other automobile insurers, the prescriptions for Fraudulent Equipment that were purportedly issued by the Referring Providers and provided to the DME Defendants were medically unnecessary, issued solely to exploit the patients for financial gain,  and intentionally generic and vague.

73.     Once the DME Defendants received the prescriptions purportedly issued by the Referring Providers, the DME Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items with HCPCS Codes that were not directly identified in the prescriptions or that differed from the HCPCS Codes that were identified in the prescriptions.

74.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the DME Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a Referring Provider, who was licensed to prescribe DME and/or OD.

75.     However, the DME Defendants attempted to maximize the amount of No-Fault Benefits that they could obtain from GEICO, and other automobile insurers, by submitting bills to GEICO that misrepresented the Fraudulent Equipment purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

76.     In a substantial majority of the charges Fraudulent Equipment identified in Exhibit "1" – to the extent that any Fraudulent Equipment was actually provided to the Insureds – the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted to GEICO by the Defendants.

77.     As part of this scheme, the DME Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment – typically dispensed to them at the Clinics in black plastic garbage bags -- that did not contain all the features required by the HCPCS Codes billed to GEICO, to the extent that any Fraudulent Equipment was provided to the Insureds in the first instance.

78.     For example, the DME Defendants used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of Fee Schedule items that could be provided to the Insureds, and then submitted bills to GEICO indicating that the DME Defendants provided the Insureds with a variation that had a higher than necessary maximum reimbursement rate under the Medicaid Fee Schedule.

79.     However, the Fraudulent Equipment actually provided did not match the HCPCS Codes identified in the bills to GEICO as the items were of inferior quality and without the specific features required by the applicable HCPCS Codes.

80.     Instead, the Fee Schedule items actually provided to Insureds – and again to the extent that any Fraudulent Equipment was actually provided – would qualify under different HCPCS Codes that had significantly lower maximum reimbursement rates than the HCPCS Codes identified in the bills submitted by the DME Defendants.

81.     The DME Defendants engaged in a pattern of submitting bills to GEICO, and other automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the

Insureds in order to obtain higher reimbursement rates than what was permissible.

82.     In furtherance of their scheme to defraud GEICO, and other automobile insurers, the DME Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public for the same item.

83.     In actuality, the bills from the DME Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public.

84.     As part of this scheme, the DME Defendants submitted bills to GEICO with reimbursement rates that indicated the Fraudulent Equipment purportedly provided Insureds were expensive and high-quality when the Fraudulent Equipment provided were cheap and poor-quality and were purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

85.     In fact, the cheap and poor quality Fraudulent Equipment provided to the Insureds – again, to the extent that any Fraudulent Equipment was actually provided – were easily obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by the Defendants.

86.     The DME Defendants submitted bills to GEICO, and other automobile insurers, seeking No-Fault Benefits for Fraudulent Equipment at rates that were grossly above the permissible reimbursement amount for Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits that they could receive.

87.     After obtaining the vague and generic prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers as a result of paying various forms of consideration,

the DME Defendants would bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; (iv) Fraudulent Equipment at grossly inflated reimbursement rates; and (v) Fraudulent Equipment that was otherwise not reimbursable.

88.     Upon information and belief, in exchange for various forms of consideration from the DME Defendants, prescriptions purportedly issued by the Referring Providers containing the same preselected Fraudulent Equipment would be provided to the DME Defendants for virtually every Insured that was injured in a motor vehicle accident and treated at a particular Clinic.

89.     After obtaining preprinted prescriptions, containing preselected DME and OD, for Fraudulent Equipment purportedly issued by the Referring Providers, the DME Defendants would bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fee Schedule items that did not represent the HCPCS codes contained in the bills to GEICO; and (iv) Fraudulent Equipment that was otherwise not reimbursable.

**B.     The Defendants' Illegal Kickback and Financial Arrangements**

90.     Upon information and belief, in order to obtain access to Insureds so the DME Defendants could implement and execute their fraudulent schemes and maximize the amount of No-Fault Benefits the DME Defendants could obtain from GEICO and other New York automobile insurers, the DME Defendants entered into illegal agreements with others who are not presently identifiable where prescriptions, or purported prescriptions, for Fraudulent Equipment were provided to the Defendants in exchange for financial consideration.

91.     Upon information and belief, since Geneva Supply's inception the DME

Defendants engaged in unlawful financial arrangements with others who are not presently identifiable in order to obtain prescriptions for Fraudulent Equipment. These schemes allowed the DME Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

92.     Upon information and belief, pursuant to the unlawful financial arrangements, the DME Defendants would pay kickbacks to others who are not presently identifiable, including individuals and entities, such as fictitious businesses, to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers.

93.     In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the DME Defendants and others who are not presently identifiable, the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols.

94.     As explained in more detail below, the DME Defendants received prescriptions purportedly issued by Referring Providers who worked at various Clinics. The prescriptions for Fraudulent Equipment from each Referring Provider were not medically necessary as they contained a predetermined set of virtually identical Fraudulent Equipment.

95.     For example, Papillon Equipment and Lament Supply received prescriptions for Fraudulent Equipment purportedly prescribed to GEICO Insureds who were being treated at the following Clinic locations:

    (i)     4104 Farragut Road, Brooklyn, New York;

    (ii)    2673 Atlantic Avenue, Brooklyn, New York;

    (iii)   3250 Westchester Avenue, Bronx, New York;

    (iv)    2379 Ralph Avenue, Brooklyn, New York;

        (v)     552 East 180th Street, Bronx, New York;

        (vi)    4250 White Plains Road, Bronx, New York;

        (vii)   2386 Jerome Avenue, Bronx, New York; and

        (viii)  1339 East Gun Hill Road, Bronx, New York

96.     In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the DME Defendants and others who are not presently identifiable, as explained in more detail below, the DME Defendants obtained vague and generic prescriptions purportedly issued by the Referring Providers that permitted the DME Defendants to bill GEICO for – among other things – Fraudulent Equipment that were not reasonable or medically necessary, in order to maximize the amount of No-Fault Benefits that the Defendants could obtain.

97.     In further keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, upon information and belief Kogan, Akopyan, and Sardjoe never met the Referring Providers who purportedly issued prescriptions that were used by the DME Defendants to bill GEICO.  Instead, the prescriptions for the Fraudulent Equipment were procured by Kogan as a result of arrangements with others who are not presently identifiable.

98.     In keeping with the fact that the DME Defendants obtained prescriptions for Fraudulent Equipment as a result of unlawful financial arrangements, the DME Defendants (i) received virtually identical predetermined sets of prescriptions from the Referring Providers operating out of the same Clinic; and (ii) obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

99.     In keeping with the fact Papillon Equipment and Lament Supply obtained the prescriptions for Fraudulent Equipment directly from the Clinics and without any involvement by

Insureds, and in some instances without any involvement by the Referring Provider, the prescriptions purportedly issued by the Referring Providers were provided directly to the DME Defendants from the Clinics' receptionists.

100.   Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, in many cases, the Insureds were provided with Fraudulent Equipment directly from the Clinics without any interaction with the DME Defendants.

101.   In further support that the Fraudulent Equipment was provided without any interaction by the DME Defendants, statements provided to GEICO by Insureds confirmed that when Insureds were actually provided with Fraudulent Equipment by Papillon Equipment, they received it directly from one of the Clinics, typically from the receptionists in black plastic garbage bags, without any involvement from the DME Defendants, and never received prescriptions for Fraudulent Equipment from a healthcare provider.

102.   For example:

(i)     On March 17, 2022, an Insured named RC was purportedly injured in a motor vehicle accident. Thereafter, RC received treatment at one of the Clinics. During an interview with a GEICO investigator, RC confirmed that he received Fraudulent Equipment in a large plastic bag from the receptionist at the Clinic.

(ii)    On May 26, 2022, an Insured named FW was purportedly injured in a motor vehicle accident. Thereafter, FW received treatment at one of the Clinics. During an interview with a GEICO investigator, FW confirmed that he received Fraudulent Equipment in a black plastic bag from the receptionist at the Clinic.

(iii)   On June 22, 2022, an Insured named TW was purportedly injured in a motor vehicle accident. Thereafter, TW received treatment at one of the Clinics. During an interview with a GEICO investigator, TW confirmed that he received Fraudulent Equipment in a black plastic bag from the receptionist at the Clinic.

(iv)    On June 22, 2022, an Insured named JE was purportedly injured in a motor vehicle accident. Thereafter, JE received treatment at one of the Clinics.

During an interview with a GEICO investigator, JE confirmed that he received Fraudulent Equipment in a black garbage bag from the receptionist at the Clinic.

(v)    On May 19, 2022, an Insured named NT was purportedly injured in a motor vehicle accident. Thereafter, NT received treatment at one of the Clinics. During an interview with a GEICO investigator, NT confirmed that he received Fraudulent Equipment in a black garbage bag from the receptionist at the Clinic.

(vi)    On May 19, 2022, an Insured named KC was purportedly injured in a motor vehicle accident. Thereafter, KC received treatment at one of the Clinics. During an interview with a GEICO investigator, KC confirmed that he received Fraudulent Equipment in a black garbage bag from the receptionist at the Clinic.

(vii)    On June 13, 2022, an Insured named DA was purportedly injured in a motor vehicle accident. Thereafter, DA received treatment at one of the Clinics. During an interview with a GEICO investigator, DA confirmed that he received Fraudulent Equipment in a black garbage bag from the receptionist at the Clinic.

(viii)    On June 8, 2022, an Insured named SW was purportedly injured in a motor vehicle accident. Thereafter, SW received treatment at one of the Clinics. During an interview with a GEICO investigator, SW confirmed that he received Fraudulent Equipment in a plastic bag from the receptionist at the Clinic.

(ix)    On June 8, 2022, an Insured named OJ was purportedly injured in a motor vehicle accident. Thereafter, OJ received treatment at one of the Clinics. During an interview with a GEICO investigator, OJ confirmed that he received Fraudulent Equipment in a plastic bag from the receptionist at the Clinic.

103.    These are only representative examples. In the claims for Fraudulent Equipment identified in Exhibits "1" and "2", as part of the DME Defendants unlawful financial arrangements with others who are presently unidentifiable, the Insureds routinely received the Fraudulent Equipment directly from the Clinics without any involvement by the DME Defendants, to the extent that the Insureds were actually provided with any Fraudulent Equipment.

104.    In all the claims identified in Exhibits "1" and "2", the DME Defendants falsely

represented that Fraudulent Equipment were provided pursuant to lawful prescriptions from healthcare providers, and where therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

### C.   The Fraudulent Prescriptions for Fraudulent Equipment

105.   In addition to the DME Defendants' unlawful financial arrangements, pursuant to agreements with others who are not presently identifiable, the DME Defendants obtained prescriptions for Fraudulent Equipment purportedly issued pursuant to predetermined fraudulent protocols, which were designed to maximize the billing that the DME Defendants – and others – could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

106.   In the claims identified in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

107.   Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

108.   In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

109.   To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

110.   However, despite virtually all of the Insureds being involved in relatively minor

and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring Providers were subject to extremely similar treatment including nearly identical prescriptions for Fraudulent Equipment.

111.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

112.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

113.    In general, the DME Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

- an Insured would arrive at a Clinic for treatment following a motor vehicle accident;
- the Insured would be seen by a Referring Provider;
- on the date of the first visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD;
- subsequently, the Insured would return to the Clinic for one or more additional evaluations and treatment by other healthcare providers, and would be provided with at least one additional prescription for a predetermined set of DME and/or OD, although the Referring Provider did not always treat the Insured on the date of the additional prescription for DME and/or OD; and
- at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Defendants to fill without any involvement by the Insured.

114.    Virtually all the claims identified in Exhibits "1" and "2" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were

purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

115.     In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

116.     Furthermore, in a legitimate setting, during a patient's course of treatment, a healthcare provider <u>may</u> – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

117.     In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

118.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

119.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in an automobile accident.

120.     If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the

healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD why any of the prescribed Fraudulent Equipment was medically necessary or how it would help the Insureds.

121.    It is improbable – to the point of impossibility – that virtually all the Insureds identified in Exhibits "1" and "2" who treated with a specific Referring Provider would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

122.    It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" and "2" who treated with different Referring Providers at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

123.    Here, and in keeping with the fact that the prescriptions provided to the DME Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" and "2" that treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment.

124.    In keeping with the fact that the prescriptions for Fraudulent Equipment used by the DME Defendants to support the charges identified in Exhibits "1" and "2" were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, many of the prescriptions were purportedly issued on dates that the Insureds never treated with the Referring Provider.

125.    Also, in keeping with the fact that the prescriptions for Fraudulent Equipment

identified in Exhibits "1" and "2" were issued pursuant to predetermined fraudulent protocols, and not for the benefit of the Insureds – as set forth below – the Referring Providers all issued similar checkmark-based prescriptions and routinely issued multiple checkmark-based prescriptions to a single patient on the same day when there was no legitimate reason to do so.

126.   In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions used by the DME Defendants to bill GEICO for the charges identified in Exhibits "1" and "2".

127.   In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibits "1" and "2" were not medical necessity but were the result of predetermined fraudulent protocols, the prescriptions typically contained vague and generic descriptions for DME and OD, which – as explained in more detail below – provided the DME Defendants with the opportunity to purportedly provide – and bill GEICO for – whatever DME or OD they wanted.

128.   Even more, and as also explained below in more detail, the charges to GEICO identified in Exhibits "1" and "2" were not based upon prescriptions for medically necessary Fraudulent Equipment because the DME Defendants purportedly provided Insureds with whatever DME or OD that they wanted, even when the Fraudulent Equipment purportedly provided – and billed to GEICO – was not the item identified in the prescriptions purportedly issued by the Referring Providers.

129.   Upon information and belief, and in further keeping with the fact that the

prescriptions for Fraudulent Equipment identified in Exhibits "1" and "2" were issued because of predetermined fraudulent protocols and not based upon medical necessity, the prescriptions purportedly issued by the Referring Providers were never given to the Insureds.

130.    Instead, upon information and belief, the Insureds were provided with Fraudulent Equipment directly from the Clinic's receptionists, without any interaction from the DME Defendants – to the extent that the Insureds actually received any Fraudulent Equipment.

131.    For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1", the DME Defendants falsely represented that Fraudulent Equipment were provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant agreements with others who are not presently identifiable.

132.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct an individual course of treatment based upon the patients' specific symptoms or presentation.

133.    Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider may – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

134.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, that directly relate to each patient's individual symptoms or presentation including: (i) whether the DME and/or OD, based upon available evidentiary and scientific information, is likely to help improve the patient's complained

of condition; (ii) whether the patient is willing and likely to use the DME and/or OD; and (iii) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history.

135.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

136.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect the mechanism of injury, and whether, how, and to what extent an individual is injured, if at all.

137.   If, after taking into account a patient's individual circumstances and situations, a healthcare provider determines that DME and/or OD is medically necessary, the healthcare provider should document in a contemporaneous medical record, such as an evaluation report, the specific DME and/or OD prescribed and why.

138.   It is extremely improbable – to the point of impossibility – that an overwhelming majority of the Insureds identified in Exhibits "1" and "2" who treated at a specific Clinic would require substantially identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and being involved in different motor vehicle accidents.

139.   Here, based upon the specific Clinic that each Insured visited, virtually all of the Insureds identified in Exhibits "1" and "2" were issued a virtually identical prescription for a predetermined set of Fraudulent Equipment.

140.   While the specific preset prescriptions of Fraudulent Equipment varied based upon the specific Clinic that the Insured visited, there were multiple items of Fraudulent Equipment that were purportedly prescribed to virtually all of the Insureds identified in Exhibits "1" and "2"

regardless of which Clinic the Insureds visited or their individual medical needs.

141.    In further keeping with the fact that the prescriptions purportedly issued by the Referring Providers were the result of predetermined fraudulent protocols, the medical records associated with the Insureds identified in Exhibits "1" and "2" virtually never included medical records that were contemporaneously written with the prescriptions, such as an evaluation report that specified the DME and/or OD prescribed and documented the medical necessity for each item.

142.    Here, not only did Insureds who treated at a specific Clinic receive virtually identical prescriptions for a predetermined set of Fraudulent Equipment, but when two or more Insureds were injured in the same accident and treated at the same Clinic, all of the Insureds received virtually identical prescriptions for Fraudulent Equipment despite being different ages, in different physical conditions, differently situated in the same motor vehicle accident, and possessing discrete individual medical needs.

143.    It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology as the result of the accident.

144.    It is extremely improbable that two or more Insureds involved in any single motor vehicle accident not only would suffer from substantially similar injuries and symptomatology but would need virtually the same specific items of DME and/or OD to aid in treating their individual symptoms.

145.    It is extremely improbable – to the point of impossibility – that this legitimately would occur over and over again, with two or more Insureds who were involved in the same accident repeatedly being prescribed virtually the same specific items of DME and/or OD to aid in treating their individual symptoms.

146.    If two or more Insureds who were involved in the same underlying motor vehicle accident received virtually identical prescriptions for Fraudulent Equipment then, by extension, all of the Insureds who were involved in the same underlying motor vehicle accident exhibited identical weaknesses in their physical conditions to warrant the same DME and/or OD.

147.    In keeping with the fact that the Referring Providers prescribed predetermined sets of Fraudulent Equipment that were provided by the DME Defendants pursuant to fraudulent protocols – and not based upon medical necessity – the Referring Providers routinely provided virtually identical prescriptions for Fraudulent Equipment to two or more Insureds who were involved in the same accident.

148.    For example:

- On July 25, 2022, two Insureds – RB and SB – were involved in the same automobile accident. Thereafter, RB and SB both presented to the same Clinic. They were each purportedly prescribed the following virtually identical Fraudulent Equipment purportedly dispensed by Papillon Equipment:

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---------|--------------------|----------------|--------------|------------------|
| RB | October 10, 2022 – October 12, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
| | | 2. Positioning cushion | E0190 | $22.04 |
| | | 3. Heat Lamp | E0205 | $223.44 |
| | | 4. Bed Board | E0273 | $101.85 |
| | | 5. Percussor electric or pneumatic | E0480 | $355.56 |
| | | 6. Neuromuscular stimulator | E0745 | $275.00 |
| | | 7. General wheelchair cushion | E2612 | $382.02 |
| | | 8. Cervical, multiple post collar | L0180 | $233.00 |
| | | 9. Lumbar orthosis | L0627 | $322.98 |

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---------|--------------------|----------------|--------------|------------------|
| SB | October 4, 2022 – October 6, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
| | | 2. Positioning cushion | E0190 | $22.04 |
| | | 3. Heat Lamp | E0205 | $223.44 |
| | | 4. Bed Board | E0273 | $101.85 |
| | | 5. Percussor electric or pneumatic | E0480 | $355.56 |
| | | 6. Neuromuscular stimulator | E0745 | $275.00 |
| | | 7. General wheelchair cushion | E2612 | $382.02 |

| | | 8. Cervical, multiple post collar | L0180 | $233.00 |
| | | 9. Lumbar orthosis | L0627 | $322.98 |

RB and SB were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment that were used by Papillon Equipment to bill GEICO.

- On July 5, 2022, two Insureds – AA and CT – were involved in the same automobile accident. Thereafter, AA and CT both presented to the same Clinic. They were each purportedly prescribed the following virtually identical Fraudulent Equipment purportedly dispensed by Papillon Equipment:

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| AA | September 29, 2022 – October 3, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
| | | 2. Positioning cushion | E0190 | $22.04 |
| | | 3. Electric heat pad | E0215 | $20.93 |
| | | 4. Water circulating heat pad | E0217 | $412.03 |
| | | 5. Bed Board | E0273 | $101.85 |
| | | 6. Cervical, multiple post collar | L0180 | $233.00 |
| | | 7. Lumbar orthosis | L0627 | $322.98 |
| | | 8. Shoulder elbow wrist hand orthosis | L3960 | $372.50 |
| | | 9. Positioning seat | T5001 | $310.00 |

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| CT | October 11, 2022 – October 13, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
| | | 2. Positioning cushion | E0190 | $22.04 |
| | | 3. Electric heat pad | E0215 | $20.93 |
| | | 4. Water circulating heat pad | E0217 | $412.03 |
| | | 5. Bed Board | E0273 | $101.85 |
| | | 6. Cervical, multiple post collar | L0180 | $233.00 |
| | | 7. Lumbar orthosis | L0627 | $322.98 |
| | | 8. Shoulder elbow wrist hand orthosis | L3960 | $372.50 |
| | | 9. Positioning seat | T5001 | $310.00 |

AA and CT were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment that were used by Papillon Equipment to bill GEICO.

- On May 13, 2022, two Insureds – MA and TM – were involved in the same automobile accident. Thereafter, MA and TM both presented to the same Clinic. They were each

purportedly prescribed the following virtually identical Fraudulent Equipment purportedly dispensed by Papillon Equipment:

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---------|--------------------|----------------|--------------|------------------|
| MA | July 29, 2022 | 1. Cervical traction equipment | E0855 | $502.63 |
|   |   | 2. Lumbar-sacral orthosis | L0637 | $844.13 |

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---------|--------------------|----------------|--------------|------------------|
| TM | July 4, 2022 | 1. Cervical traction equipment | E0855 | $502.63 |
|   |   | 2. Lumbar-sacral orthosis | L0637 | $844.13 |

MA and TM were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment that were used by Papillon Equipment to bill GEICO.

- On April 28, 2022, two Insureds – DL and EW – were involved in the same automobile accident. Thereafter, DL and EW both presented to the same Clinic. They were each purportedly prescribed the following virtually identical Fraudulent Equipment purportedly dispensed by Papillon Equipment:

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---------|--------------------|----------------|--------------|------------------|
| DL | July 18, 2022 – July 19, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
|   |   | 2. Positioning cushion | E0190 | $22.04 |
|   |   | 3. Electric heat pad | E0215 | $20.93 |
|   |   | 4. Bed Board | E0273 | $101.85 |
|   |   | 5. Cold/hot pack | E1399 | $29.00 |
|   |   | 6. Massager percussor | E1399 | $355.56 |
|   |   | 7. Wheelchair cushion | E2612 | $382.02 |
|   |   | 8. Lumbar orthosis | L0627 | $322.98 |
|   |   | 9. Position seat | T5001 | $310.00 |

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---------|--------------------|----------------|--------------|------------------|
| EW | June 23, 2022 – June 24, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
|   |   | 2. Positioning cushion | E0190 | $22.04 |
|   |   | 3. Electric heat pad | E0215 | $20.93 |
|   |   | 4. Bed Board | E0273 | $101.85 |
|   |   | 5. Cold/hot pack | E1399 | $29.00 |
|   |   | 6. Massager percussor | E1399 | $355.56 |
|   |   | 7. Wheelchair cushion | E2612 | $382.02 |
|   |   | 8. Lumbar orthosis | L0627 | $322.98 |

|  |  | 9. Position seat | T5001 | $310.00 |
|---|---|---|---|---|

DL and EW were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment that were used by Papillon Equipment to bill GEICO.

- On May 7, 2022, two Insureds – TB and VE – were involved in the same automobile accident. Thereafter, TB and VE both presented to the same Clinic. They were each purportedly prescribed the following virtually identical Fraudulent Equipment purportedly dispensed by Papillon Equipment:

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| TB | July 12, 2022 – July 13, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
|  |  | 2. Positioning cushion | E0190 | $22.04 |
|  |  | 3. Water circulating heat pad | E0217 | $412.03 |
|  |  | 4. Bed Board | E0273 | $101.85 |
|  |  | 5. Wheelchair cushion | E2612 | $382.02 |
|  |  | 6. Lumbar orthosis | L0627 | $322.98 |

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| VE | July 14, 2022 – July 15, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
|  |  | 2. Positioning cushion | E0190 | $22.04 |
|  |  | 3. Water circulating heat pad | E0217 | $412.03 |
|  |  | 4. Bed Board | E0273 | $101.85 |
|  |  | 5. Wheelchair cushion | E2612 | $382.02 |
|  |  | 6. Lumbar orthosis | L0627 | $322.98 |

TB and VE were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment that were used by Papillon Equipment to bill GEICO.

- On October 15, 2022, two Insureds – LM and JP – were involved in the same automobile accident. Thereafter, LM and JP both presented to the same Clinic. They were each purportedly prescribed the following virtually identical Fraudulent Equipment purportedly dispensed by Lament Supply:

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| LM | November 1, 2022 – | 1. Dry pressure mattress | E0184 | $153.13 |
|  |  | 2. Positioning cushion | E0190 | $22.04 |

|  | December 20, 2022 | 3. Heat Lamp | E0205 | $223.44 |
|  |  | 4. Water circulating heat pad | E0217 | $412.03 |
|  |  | 5. Bed Board | E0273 | $101.85 |
|  |  | 6. Percussor electric | E0480 | $355.56 |
|  |  | 7. Neuromuscular stimulator | E0745 | $325.00 |
|  |  | 8. Whirlpool portable | E1300 | $150.00 |
|  |  | 9. Wheelchair cushion | E2612 | $382.02 |
|  |  | 10. Lumbar orthosis | L0627 | $322.98 |

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| JP | November 4, 2022 - December 12, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
|  |  | 2. Positioning cushion | E0190 | $22.04 |
|  |  | 3. Heat Lamp | E0205 | $223.44 |
|  |  | 4. Water circulating heat pad | E0217 | $412.03 |
|  |  | 5. Bed Board | E0273 | $101.85 |
|  |  | 6. Percussor electric | E0480 | $355.56 |
|  |  | 7. Neuromuscular stimulator | E0745 | $325.00 |
|  |  | 8. Whirlpool portable | E1300 | $150.00 |
|  |  | 9. Wheelchair cushion | E2612 | $382.02 |
|  |  | 10. Lumbar orthosis | L0627 | $322.98 |

LM and JP were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment that were used by Lament Supply to bill GEICO.

- On October 9, 2022, two Insureds – BH and IM – were involved in the same automobile accident. Thereafter, BH and IM both presented to the same Clinic. They were each purportedly prescribed the following virtually identical Fraudulent Equipment purportedly dispensed by Lament Supply:

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| BH | November 16, 2022 – November 28, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
|  |  | 2. Positioning cushion | E0190 | $22.04 |
|  |  | 3. Electric heat pad | E0215 | $20.93 |
|  |  | 4. Bed Board | E0273 | $101.85 |
|  |  | 5. Cervical traction equipment | E0855 | $502.63 |
|  |  | 6. Wheelchair cushion | E2612 | $382.02 |

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| IM | November 25, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
|  |  | 2. Positioning cushion | E0190 | $22.04 |

| | | 3. Electric heat pad | E0215 | $20.93 |
| | | 4. Bed Board | E0273 | $101.85 |
| | | 5. Cervical traction equipment | E0855 | $502.63 |
| | | 6. Wheelchair cushion | E2612 | $382.02 |

BH and IM were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment that were used by Lament Supply to bill GEICO.

- On September 10, 2022, two Insureds – KG and DN – were involved in the same automobile accident. Thereafter, KG and DN both presented to the same Clinic. They were each purportedly prescribed the following virtually identical Fraudulent Equipment purportedly dispensed by Lament Supply:

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| KG | November 4, 2022 – November 16, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
| | | 2. Positioning cushion | E0190 | $22.04 |
| | | 3. Heat Lamp | E0205 | $223.44 |
| | | 4. Water circulating heat pad | E0217 | $412.03 |
| | | 5. Bed Board | E0273 | $101.85 |
| | | 6. Percussor electric | E0480 | $355.56 |
| | | 7. Neuromuscular stimulator | E0745 | $325.00 |
| | | 8. Whirlpool portable | E1300 | $150.00 |
| | | 9. Wheelchair cushion | E2612 | $382.02 |
| | | 10. Lumbar orthosis | L0627 | $322.98 |

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| DN | November 6, 2022 – November 14, 2022 | 1. Dry pressure mattress | E0184 | $153.13 |
| | | 2. Positioning cushion | E0190 | $22.04 |
| | | 3. Heat Lamp | E0205 | $223.44 |
| | | 4. Water circulating heat pad | E0217 | $412.03 |
| | | 5. Bed Board | E0273 | $101.85 |
| | | 6. Percussor electric | E0480 | $355.56 |
| | | 7. Neuromuscular stimulator | E0745 | $325.00 |
| | | 8. Whirlpool portable | E1300 | $150.00 |
| | | 9. Wheelchair cushion | E2612 | $382.02 |
| | | 10. Lumbar orthosis | L0627 | $322.98 |

KG and DN were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment that were

used by Lament Supply to bill GEICO.

- On August 2, 2022, two Insureds – DS and SS – were involved in the same automobile accident. Thereafter, DS and SS both presented to the same Clinic. They were each purportedly prescribed the following virtually identical Fraudulent Equipment purportedly dispensed by Lament Supply:

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| DS | November 11, 2022 – November 23, 2022 | 1. Heat Lamp | E0205 | $223.44 |
| | | 2. Percussor electric | E0480 | $355.56 |
| | | 3. Neuromuscular stimulator | E0745 | $325.00 |
| | | 4. Cervical traction equipment | E0855 | $502.63 |
| | | 5. Lumbo-sacral orthosis | L0637 | $844.13 |

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| SS | December 5, 2022 – December 20, 2022 | 1. Heat Lamp | E0205 | $223.44 |
| | | 2. Percussor electric | E0480 | $355.56 |
| | | 3. Neuromuscular stimulator | E0745 | $325.00 |
| | | 4. Cervical traction equipment | E0855 | $502.63 |
| | | 5. Lumbo-sacral orthosis | L0637 | $844.13 |

DS and SS were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment that were used by Lament Supply to bill GEICO.

- On October 25, 2022, two Insureds – DK and RM – were involved in the same automobile accident. Thereafter, DK and RM both presented to the same Clinic. They were each purportedly prescribed the following virtually identical Fraudulent Equipment purportedly dispensed by Lament Supply:

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| DK | December 23, 2022 – December 27, 2022 | 1. Heat Lamp | E0205 | $223.44 |
| | | 2. Percussor electric | E0480 | $355.56 |
| | | 3. Neuromuscular stimulator | E0745 | $325.00 |
| | | 4. Whirlpool portable | E1300 | $150.00 |

| Patient | Dispensing Date(s) | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| RM | December 13, 2022 – December 15, | 1. Heat Lamp | E0205 | $223.44 |
| | | 2. Percussor electric | E0480 | $355.56 |
| | | 3. Neuromuscular stimulator | E0745 | $325.00 |

| | 2022 | 4. Whirlpool portable | E1300 | $150.00 |
|---|---|---|---|---|

DK and RM were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment that were used by Lament Supply to bill GEICO.

149.     These are only representative examples.  In many of the claims identified in Exhibit "1," two or more Insureds involved in the same underlying accident were prescribed virtually identical prescriptions for Fraudulent Equipment that were used by the DME Defendants to bill GEICO, despite the fact that the Insureds were differently situated.

150.     What is more, virtually all of the insureds identified in Exhibits "1" and "2" receiving multiple items of virtually identical Fraudulent Equipment would, by extension, mean that all those Insureds – who reported to one of the Referring Providers across the New York metropolitan area – had symptoms and physical examination findings that justified prescriptions for identical Fraudulent Equipment.

151.     In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the DME Defendants were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there were contemporaneously dated medical records, such as an initial examination report or a follow-up examination report, the reports virtually never documented the need for Fraudulent Equipment purportedly prescribed to the Insureds or explained why the healthcare provider prescribed any of the Fraudulent Equipment.

152.     To the extent that any of the contemporaneously dated medical records did identify Fraudulent Equipment purportedly prescribed by the Referring Providers, the medical records never explained the medical necessity for the Fraudulent Equipment, did not identity or reference all of the Fraudulent Equipment contained on the prescriptions, and – on some occasions –

identified DME/OD that was not included on the prescription purportedly issued by the Referring Providers.

153.    In further keeping with the fact that the prescriptions for Fraudulent Equipment provided to the DME Defendants were not medically necessary and were provided pursuant to predetermined fraudulent protocols, on many occasions, the prescriptions purportedly issued by the Referring Providers were often issued on dates that the Insureds did not treat with the Referring Providers.

154.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the DME Defendants from the Clinics were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports did not contain sufficient information to explain why any of the Fraudulent Equipment was prescribed.

155.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment from the Clinics were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, to the extent that prescriptions for Fraudulent Equipment were contemporaneously dated with follow-up examinations, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

156.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME and/or OD, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued

DME and/or OD.

157.    However, the follow-up examination reports from Referring Providers, at the Clinics failed to include any meaningful information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date, if at all.

158.    Furthermore, and in keeping with the fact that the prescriptions issued by Duroseau at the Clinics to the Insureds identified in Exhibits "1" and "2" were not medically necessary and were issued pursuant to a predetermined fraudulent protocol, multiple prescriptions purportedly issued by the Referring Providers, including those using the names Duroseau, Whitney, and Fialkov, contained a photocopied signature while prescriptions in the names of other Referring Providers (with medical licenses) were issued in their name but inexplicably on the letterhead of physical therapy professional corporations as to which the doctors had no ownership interest or employment relationship.

159.    Additionally, as part of the fraudulent scheme, the prescriptions purportedly issued by Referring Providers at the Clinics were never given to the Insureds but were routed directly to the Defendants and other DME/OD suppliers, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source or not fill all or part of the prescription. In fact, in many cases, the Insureds were provided with Fraudulent Equipment directly from receptionists at the Clinics, without any interaction with or instruction concerning their use from the Defendants, other DME/OD suppliers, or a healthcare provider.

### D.    The Distribution of Fraudulent Equipment to Insureds by the Defendants Without Prescriptions Identifying DME/OD

160.    Papillon Equipment and Lament Supply are not licensed medical professional corporations, and neither Kogan, Akopyan, nor Sardjoe are licensed healthcare providers. As such, the Defendants were not lawfully permitted to prescribe DME and OD to Insureds. For the same

reason, the DME Defendants cannot properly dispense DME and/or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies the DME and/or OD to be provided.

161.    However, and just as with Geneva Supply, in many of the fraudulent claims identified in Exhibits "1" and "2", the Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider to the extent that they actually provided any DME or OD to the Insureds.

162.    More specifically, the prescriptions for DME and/or OD purportedly issued by the Referring Providers and provided to the Defendants were vague and generic because the prescriptions did not definitively identify the DME and/or OD to be provided. For example, the vague and generic prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Defendants to a unique type of DME and/or OD.

163.    Even more, in many of the fraudulent claims identified in Exhibits "1" and "2", the DME Defendants improperly decided what DME and OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider because the Defendants provided Fraudulent Equipment that was not identified on the prescription.

164.    The vague and generic prescriptions purportedly issued by the Referring Providers were intended to and actually provided the DME Defendants the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule, as part of their scheme with others who are presently unidentifiable.

165.    In a legitimate clinical setting, a healthcare provider would issue a prescription that provided either an HCPCS Code or a sufficient description that identified a specific type of

medically necessary item of DME or OD, and the DME/OD retailer would be able to determine the specific device that was necessary for the patient.

166.     Also in a legitimate setting, to the extent that a prescription from a healthcare provider is not sufficiently detailed to identify a specific type of DME or OD, the DME/OD retailer would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements in order to dispense the appropriate DME and/or OD prescribed to each patient.

167.     Upon information and belief, the DME Defendants never contacted the referring healthcare provider to seek instruction and/or clarification, but rather made their own determination as to the specific Fraudulent Equipment purportedly provided to each Insured. Not surprisingly, the DME Defendants elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate at the higher end of the permissible range under the Medicaid Fee Schedule.

168.     For example, the DME Defendants regularly submitted bills to GEICO predicated upon prescriptions for a "lumbar sacrum orthosis", "lumbo-sacral support "or "LSO-Lumbar support". These descriptions correspond to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds, including:

>     (i)      HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.
>
>     (ii)     HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.
>
>     (iii)    HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv) HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v) HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi) HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii) HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $ 806.64.

(viii) HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $ 1150.00.

(ix) HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x) HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi) HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii) HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xiii) HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv) HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xv) HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient,

which has a maximum reimbursement rate of $844.13.

(xvi)   HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)  HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii) HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)   HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx)    HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)   HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)  HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii) HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

169.   As unlicensed healthcare providers, the DME Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription for a "lumbar sacrum orthosis", "lumbo-sacral support", or "LSO-Lumbar support".

170.   However, upon information and belief, the DME Defendants never contacted the Referring Provider, and instead decided themselves which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly purportedly provide the Insureds based upon the

vague and generic prescriptions for Fraudulent Equipment.

171.    In fact, virtually every time that the DME Defendants received a prescription from the Referring Providers for a "lumbar sacrum orthosis", "lumbo-sacral support", or "LSO-Lumbar support" the Defendants billed GEICO using HCPCS Code L0627 requesting a reimbursement of $322.98, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

172.    The vague and generic descriptions that the Defendants used to bill for specific types of OD were not limited to lumbar orthotics. For example, the DME Defendants submitted bills to GEICO containing charges based upon prescriptions for a "cervical collar". Like the different types of lumbar orthotics, there are more than 12 different types of cervical collars, each with its own HCPCS Code and reimbursement amount.

173.    The DME Defendants were not legally permitted to determine which of the available options were medically necessity for each Insured based upon the vague prescriptions of "cervical collar."

174.    However, each and every time that the DME Defendants received a prescription from the Referring Providers for a "cervical collar", the Defendants billed GEICO using HCPCS Code L0180 requesting a reimbursement of $233.00, and thereby asserted that they provided the Insureds with that specific item.

175.    These are only representative examples. To the extent that the DME Defendants actually provided Fraudulent Equipment, they unlawfully prescribed the Fraudulent Equipment for virtually all of the claims identified in Exhibits "1" and "2" that are based upon vague and generic prescriptions because the DME Defendants decided which specific items of DME and/or OD to provide to the Insureds.

176.    The Fraudulent Equipment provided to the Insureds identified in Exhibits "1" and "2" – to the extent that the Fraudulent Equipment was actually provided by the DME Defendants -- was not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME and/or OD; or (ii) a determination by a licensed healthcare provider that the specific items dispensed to the Insureds were medically necessity. Rather, the Fraudulent Equipment identified in Exhibits "1" and "2" were the result of decisions by the Defendants.

177.    In all of the claims identified in Exhibits "1" and "2" that were based upon vague and generic language contained in the prescriptions, the DME Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by the Defendants own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, was not eligible for reimbursement of PIP Benefits.

### E.    The Defendants' Fraudulent Billing for DME and OD

178.    The bills submitted to GEICO and other New York automobile insurers by the DME Defendants were also fraudulent in that they misrepresented the DME and OD purportedly provided to the Insureds.

179.    In the bills and other documents submitted to GEICO, the DME Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were based upon some legitimate arms-length relationship, when the prescriptions for Fraudulent Equipment were based upon the unlawful financial arrangements between the Defendants and others who are not presently identifiable.

180.    In the bills and other documents submitted to GEICO, the DME Defendants also

misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to unlawful financial arrangements between the DME Defendants and others who are presently unidentifiable.

181.    Further, the DME Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when the Fraudulent Equipment purportedly provided were based upon decisions made by laypersons.

182.    Moreover, and as explained below, the bills submitted to GEICO by the DME Defendants misrepresented, to the extent that any Fraudulent Equipment was provided: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to GEICO, when they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

183.    Thereafter, in an attempt to conceal their scheme to fraudulently bill GEICO for DME/OD purportedly provided to GEICO's Insureds, the DME Defendants would submit multiple bills to GEICO for Fraudulent Equipment purportedly provided to a single Insured on the same day.

184.    The DME Defendants regularly used prescriptions purportedly issued by the Referring Providers containing multiple items of Fraudulent Equipment and would submit two or more bills to GEICO for Fraudulent Equipment purportedly provided to Insureds based on a single prescription, when all of the Fraudulent Equipment billed to GEICO was issued to the Insured on the same day.

185.    There is also no legitimate reason why the DME Defendants would submit multiple

bills to GEICO for Fraudulent Equipment purportedly provided on a single date.

186.    Upon information and belief, the DME Defendants split the Fraudulent Equipment purportedly provided to the Insureds on multiple bills in order to conceal the extent of the fraudulent charges billed to GEICO.

### 1. The Defendants' Fraudulently Misrepresented the Fee Schedule Items Purportedly Provided

187.    When the DME Defendants' submitted bills to GEICO seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

188.    As indicated above, the New York Fee Schedule provides that the Medicaid Fee Schedule is used to determine the amount to pay for Fee Schedule items. The Medicaid Fee Schedule specifically defines the requirements for each HCPCS code used to bill for DME and/or OD.

189.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet to qualify for reimbursement under a specific HCPCS code for both Fee Schedule items and Non-Fee Schedule items.

190.    By submitting bills to GEICO containing specific HCPCS Codes the Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

191.    However, except for codes relating to positioning pillows/cushions under HCPCS Code E0190 and electric heating pads under HCPCS Code E0215, in virtually all of the bills submitted to GEICO for Fee Schedule items, the Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

192.     The prescriptions from the healthcare providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. By contrast, the DME Defendants' submitted bills to GEICO containing HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

193.     As indicated above, as part of the unlawful financial arrangements between the DME Defendants and others who are not presently identifiable, the DME Defendants were provided with prescriptions purportedly issued by the Referring Providers pursuant to predetermined fraudulent protocols, which provided the Defendants with the opportunity to increase the amount they could bill GEICO for Fraudulent Equipment purportedly provided to the Insureds.

194.     Accordingly, just as with Geneva Supply, the DME Defendants obtained vague and generic prescriptions for Fraudulent Equipment that permitted them to choose between multiple types of products that would fit the vague description contained on the prescription.

195.     Although several options were available to the DME Defendants based upon the vague and generic prescriptions, the DME Defendants virtually always billed GEICO – and likely other New York automobile insurers – using HCPCS Codes with higher reimbursement amounts than necessary, which was done so for their financial benefit.

196.     However, despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the DME Defendants provided any Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

197.     As identified in the claims contained within Exhibits "1" and "2", the DME

Defendants frequently submitted bills to GEICO for Fraudulent Equipment that was purportedly "custom fitted" for each Insured when – to the extent that the Fraudulent Equipment was actually provided to the Insureds – the Defendants never customized the Fraudulent Equipment as billed.

198.    For example, the DME Defendants used the vague and generic language in the prescriptions purportedly issued from the Referring Providers to bill GEICO for the following:  (i) a lumbar orthotic using HCPCS Code L0627 with a charge of $322.98 per unit; (ii) a lumbar orthotic using HCPCS Code L0637 with a charge of $844.13 per unit (iii) a thoracic LSO using HCPCS Code L0456 with a charge of $778.11 per unit; (iv) a knee orthotic using HCPCS Code L1832 with a charge of $607.55; (v) a wrist-hand-finger orthosis using HCPCS Code L3806 with a charge of $347.95; (vi) a shoulder-elbow-wrist-hand orthotic using HCPCS Code L3960 with a charge of $372.50; and (vii) a cervical collar using HCPCS Code L0180 with a charge of $233.00.

199.    However, the bills to GEICO for HCPCS Codes L0627, L0637, L0456, L1832, L3806, L3960, and L0180 fraudulently misrepresented the type of Fraudulent Equipment the DME Defendants purportedly provided to Insureds as the OD the Defendants provided – to the extent that the Fraudulent Equipment was actually provided – were not reimbursable under the specific HCPCS Codes billed to GEICO.

200.    The products assigned to HCPCS Codes L0627, L0637, L0456, L1832, L3806, L3960, and L0180 are a different type of OD that have been customized to fit a specific patient by an individual with expertise.

201.    However, despite billing GEICO – and other New York automobile insurers – using HCPCS Codes L0627, L0637, L0456, L1832, L3806, L3960, and L0180, the specific orthotic provided by the DME Defendants – to the extent that the L0627, L0637, L0456, L1832, L3806, L3960, and L0180 because – at a minimum – the items were never customized to fit each patient.

202.    In keeping with the fact that the claims identified in Exhibits "1" and "2" for custom-fitted OD, including the claims for HCPCS Codes L0627, L0637, L0456, L1832, L3806, L3960, and L0180 fraudulently misrepresented that the DME Defendants satisfied all the requirements for the billed HCPCS Codes, upon information and belief, the DME Defendants did not, and could not have, custom-fitted the OD as required.

203.    To the extent that any of the charges identified in Exhibits "1" and "2" for custom-fitted OD, including the claims for HCPCS Codes L0627, L0637, L0456, L1832, L3806, L3960, and L0180, were provided, the DME Defendants never customized the equipment as required by Palmetto.

204.    In order to help clarify the term "custom fitted", Palmetto defined a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

205.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for an off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." See Palmetto, Correct Coding –

Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

206.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

207.    In the claims identified in Exhibits "1" and "2" for custom-fitted OD, including the claims for HCPCS Codes L0627, L0637, L0456, L1832, L3806, L3960, and L0180, the Defendants fraudulently misrepresented that the Defendants provided the Insureds with OD that was custom-fitted as defined by Palmetto, by a certified orthotist.

208.    Instead, to the extent that the DME Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted OD, including the charges for HCPCS Codes L0627, L0637, L0456, L1832, L3806, L3960, and L0180, the DME Defendants dropped off the Fraudulent Equipment without taking any action to custom-fit the OD. To the extent that the DME Defendants attempted to make any adjustments to the Insureds identified in Exhibits "1" and "2" that received custom-fitted OD, the DME Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

209.    In keeping with the fact that the DME Defendants misrepresented that they custom-

fitted OD purportedly provided to Insureds and billed to GEICO, Kogan is not a certified orthotist and did not complete sufficient training to become a certified orthotist.

210.    In addition to submitting hundreds of fraudulent charges for custom-fitted OD, the DME Defendants fraudulently misrepresented other Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – and billed to GEICO in order to maximize profits.

211.    The claims identified in Exhibits "1" and "2" for HCPCS Code E2612 is an example of how the DME Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

212.    Each of the claims identified within Exhibits "1" and "2" for HCPCS Code E2612 contained a charge for $382.02 based upon a prescription for a "lumbar cushion."

213.    However, the product represented by HCPCS Code E2612 is defined as a wheelchair seat cushion that is greater than 22" in width, including any mounting hardware.

214.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2612, the items provided by the DME Defendants – to the extent that the Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion – were not cushions for use with a wheelchair that included mounting hardware.

215.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibits "1" and "2", who were provided with a cushion by the DME Defendants that was billed to GEICO under HCPCS Code E2612, were in a wheelchair.

216.    To the extent that any items were actually provided to the Insureds for the charges

identified in Exhibits "1" and "2" under HCPCS Code E2612, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

217.     Unlike the fraudulent charges for $382.02 for each lumbar cushion billed under HCPCS Code E2612 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

218.     In each of the claims identified within Exhibits "1" and "2" where the DME Defendants billed for Fraudulent Equipment under HCPCS Code E2612, each of the bills fraudulently mispresented that the DME Defendants provided the Insureds with equipment in response to a prescription for a wheelchair cushion and that item satisfies the requirements of HCPCS Code E2612.

219.     The claims identified in Exhibits "1" and "2" for HCPCS Code E0480 is another example of how the DME Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

220.     The DME Defendants routinely submitted charges of $355.98 using HCPCS Code E0480 based upon prescriptions for a "massage," "back massager," or "massager."

221.     However, product represented by HCPCS Code E0480 is defined as an airway clearance percussor used to help prevent aspiration, and HCPCS Code E0480 is used for providing or renting such device.

222.    Upon information and belief, by contrast, to the extent that any items were provided, they were personal massagers.  Personal massagers are Non-Fee Schedule items, which should have been billed under HCPCS Code E1399, with a reimbursement rate that is the lesser of 150% of the acquisition cost to the DME Defendants or the cost to the general public and based upon information and belief the permissible reimbursement rate was significantly less than the $355.98 charged by the DME Defendants.

223.    In each of the claims identified within Exhibits "1" and "2" where the DME Defendants billed for Fraudulent Equipment under HCPCS Code E0480, each of the bills fraudulently misrepresented that the DME Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0480.

224.    The claims identified in Exhibits "1" and "2" for HCPCS Code E0184 is another example of how the DME Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

225.    The DME Defendants routinely submitted charges of $153.13 using HCPCS Code E0184 based upon prescriptions for an "eggcrate mattress" or "dry pressure mattress".

226.    The product represented by HCPCS Code E0184 is defined as a dry pressure mattress, which is an actual mattress, not a mattress pad.

227.    Upon information and belief, by contrast, to the extent that any items were provided, they were mattress pads/toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

228.    The mattress pads/toppers actually dispensed by the DME Defendants – to the

extent that they provided any mattress pads/toppers to Insureds – have a maximum reimbursement rate of $19.48 for each mattress pad/topper, well below the fraudulent charges submitted to GEICO by the Defendants seeking $153.13 for each unit.

229.    In each of the claims identified within Exhibits "1" and "2" where the DME Defendants billed for Fraudulent Equipment under HCPCS Code E0184, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0184.

230.    The claims identified in Exhibits "1" and "2" for HCPCS Code T5001 is another example of how the DME Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

231.    The DME Defendants regularly submitted charges for $310.00 using HCPCS Code T5001 based upon prescriptions for an "car seat support" or "orthopedic car seat."

232.    However, the product represented by HCPCS Code T5001 is defined as a positioning seat for persons with special orthopedic needs, which is for persons who are unable to rely on their vehicles' built-in restraint systems due to their special orthopedic needs.

233.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code T5001, the items provided by the DME Defendants – to the extent that the Defendants provided the Insureds with any item – were not positioning seats for persons with special orthopedic needs, as required by HCPCS Code T5001.

234.    By contrast, to the extent that any items were provided, they were seat pads or cushions, the items were positioning cushions that fall within the Fee Schedule under HCPCS Code E0190, which is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes

all components and accessories."

235. Unlike the fraudulent charges for $310.00 for each "orthopedic car seat" billed under HCPCS Code T5001, the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

236. In each of the claims identified within Exhibits "1" and "2" where the DME Defendants billed for Fraudulent Equipment under HCPCS Code T5001, each of the bills fraudulently misrepresented that the DME Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code T5001.

237. With the exception of the claims for HCPCS Codes E0190 and E0215, in each of the claims for Fee Schedule items identified within Exhibits "1" and "2", to the extent that any Fraudulent Equipment was actually provided, the DME Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain, and where therefore not eligible to collect No-Fault Benefits in the first instance.

### 2. The Defendants' Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items

238. When the DME Defendants' submitted bills to GEICO for Non-Fee Schedule items the DME Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

239. As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

240. By submitting bills to GEICO for Non-Fee Schedule items, the DME Defendants represented that they requested permissible reimbursement amounts that were calculated as the

lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

241.    However, in virtually all of the charges to GEICO identified in Exhibits "1" and "2" for Non-Fee Schedule items, the DME Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

242.    Instead, the DME Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

243.    Just as with Geneva Supply, the DME Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent that they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

244.    When the DME Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of the DME Defendants' acquisition cost of purportedly high-quality items. In actuality, the Defendants' legitimate acquisition cost for the low-quality items were significantly less.

245.    In an effort to further their scheme, upon information and belief, the DME Defendants, never researched the cost to the general public of the low-cost and low-quality Non-Fee Schedule items purportedly provided to the DME Defendants.

246.    In keeping with the fact that the DME Defendants fraudulently misrepresented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule

items solely for their financial benefit, the DME Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by virtually never submitting a copy of their acquisition invoices in conjunction with their bills.

247.    As part of their scheme to defraud GEICO and other insurers, the DME Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

248.    Upon information and belief, the DME Defendants also purposefully avoided researching the cost to the general public of the Non-Fee Schedule items that they purportedly provided because they knew that those items would be sold at significantly less than charges they submitted to GEICO and other automobile insurers.

249.    As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibits "1" and "2" virtually always misrepresented the permissible reimbursement amount.

250.    For example, the DME Defendants billed GEICO for hundreds of infrared heat lamps under HCPCS Code E0205 with a charge of $223.44 per unit that was falsely represented as a permissible reimbursement amount for this Non-Fee Schedule item.

251.    Upon information and belief, to the extent that any items were provided, the infrared lamps were low quality items, and the permissible reimbursement rate was significantly less than the $223.44 charged by the DME Defendants.

252.    In each of the claims identified within Exhibits "1" and "2" where the DME Defendants billed for infrared heat lamps using HCPCS Code E0205, the Defendants fraudulently

sought reimbursement for $223.44 per unit when the maximum reimbursement charge was significantly less than $223.44.

253.    Similarly, the DME Defendants billed GEICO for water circulating heat pads with pump under HCPCS Code E0217 with a charge of $412.03 per unit, which falsely represented that the charge was the lesser of 150% of the Defendants' acquisition cost or the price to the general public.

254.    Upon information and belief, to the extent that any items were provided, the water circulating heat pads with pump were low quality items and the permissible reimbursement rate was significantly less than the $412.03 charged by the DME Defendants.

255.    In each of the claims identified within Exhibits "1" and "2" where the DME Defendants billed for a water circulating heat pad with pump using HCPCS Code E0217, the DME Defendants fraudulently sought reimbursement for $412.03 per unit when the maximum reimbursement charge was significantly less than $412.03.

256.    The DME Defendants also billed GEICO for bed boards under HCPCS Code E0273 with a charge of $101.85 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

257.    Upon information and belief, to the extent that any items were provided, the bed boards were low quality cardboard items, and the permissible reimbursement rate was significantly less than the $101.85 charged by the DME Defendants.

258.    In virtually all of the charges submitted to GEICO for a bed board, the DME Defendants fraudulently sought reimbursement for $101.85 per unit when the maximum reimbursement charge was significantly less than $101.85.

259.    The DME Defendants also billed GEICO for EMS units under HCPCS Code E0745

with a charge of $275.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

260.    Upon information and belief, to the extent that any items were provided, the EMS units were low quality items, and the permissible reimbursement rate was significantly less than the $275.00 charged by the DME Defendants.

261.    In virtually all the charges submitted to GEICO for EMS units, the DME Defendants fraudulently sought reimbursement for $275.00 per unit when the maximum reimbursement charge was significantly less than $275.00.

262.    The DME Defendants also billed GEICO for portable whirlpools under HCPCS Code E1300 with a charge of $150.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

263.    Upon information and belief, to the extent that any items were provided, portable whirlpools were low quality items, and the permissible reimbursement rate was significantly less than the $150.00 charged by the DME Defendants.

264.    In virtually all of the charges submitted to GEICO for portable whirlpools, the DME Defendants fraudulently sought reimbursement for $150.00 per unit when the maximum reimbursement charge was significantly less than $150.00.

265.    In each of the claims identified within Exhibits "1" and "2" for Non-Fee Schedule items, the DME Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for Non-Fee Schedule items were the lesser of 150% of the acquisition cost or the cost to the general public and were therefore not eligible to collect No-Fault Benefits in the first instance.

## IV.    <u>The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO</u>

266.   To support their fraudulent charges, the DME Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of Papillon Equipment and Lament Supply, seeking payment for Fraudulent Equipment.

267.   The NF-3 forms, HCFA-1500 forms and treatment reports that the DME Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items; and (d) violated a prior settlement agreement prohibiting Kogan from submitting billing to GEICO for DME and/or OD.

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amount for Non-Fee Schedule items identified in the NF-3

forms, HCFA-1500 forms, and treatment notes.

**V.      The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

268.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

269.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

270.    Specifically, they knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – provided to the Defendants as a result of unlawful financial arrangements, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

271.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to the Defendants were – not based upon medical necessity but – based upon predetermined fraudulent protocols and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

272.    Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

273.    Even more, the Defendants knowingly misrepresented and concealed that the

HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

274.    The Defendants also knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

274.    Lastly, the billing and supporting documentation submitted by the Defendants for the Fraudulent Equipment, when viewed in isolation, does not reveal its fraudulent nature.

275.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

276.    The Defendants' collection efforts through numerous separate No-Fault collection proceedings, which proceedings may continue for years, are an essential part of their fraudulent scheme since the Defendants know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

277.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO

incurred damages of more than $390,000.00 based upon the fraudulent charges.

278.   Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

<u>**FIRST CAUSE OF ACTION**</u>
**Against Papillon Equipment and Lament Supply**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

279.   GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 304 of this Complaint as if fully set forth at length herein.

280.   There is an actual case in controversy between GEICO and Papillon Equipment and Lament Supply regarding more than $283,000.00 in fraudulent billing that has been submitted to GEICO in the name of Papillon Equipment and Lament Supply.

280.   Papillon Equipment and Lament Supply have no right to receive payment for any pending bills submitted to GEICO because Papillon Equipment and Lament Supply billed for Fraudulent Equipment that were not medically necessary and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

281.   Papillon Equipment and Lament Supply have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were the result of unlawful, collusive, kickback and financial arrangements.

281.   Papillon Equipment and Lament Supply have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Equipment was purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions;

282.     Papillon Equipment and Lament Supply have no right to receive payment for any pending bills submitted to GEICO because – to the extent Papillon Equipment and Lament Supply actually provided any Fraudulent Equipment – Papillon Equipment and Lament Supply misrepresented the Fee Schedule items purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

283.     Papillon Equipment and Lament Supply has no right to receive payment for any pending bills submitted to GEICO because – to the extent Papillon Equipment and Lament Supply provided any Fraudulent Equipment – Papillon Equipment and Lament Supply misrepresented that the charges for Non-Fee Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

284.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Papillon Equipment or Lament Supply.

### SECOND CAUSE OF ACTION
**Against Kogan and Akopyan**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

285.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 304 of this Complaint as if fully set forth at length herein.

286.     Papillon Equipment is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

287.     Kogan and Akopyan knowingly conducted and/or participated, directly or indirectly, in the conduct of Papillon Equipment's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis

for approximately one year seeking payments that Papillon Equipment was not eligible to receive under the New York No-Fault Laws because: (i) Papillon Equipment billed for Fraudulent Equipment that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care and/or medically necessity; (ii) Papillon Equipment submitted bills to GEICO for Fraudulent Equipment were the result of unlawful, collusive, kickback financial arrangements; (iii) the Fraudulent Equipment was purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iv) to the extent that Papillon Equipment actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the Fee Schedule items actually provided; and (v) to the extent that Papillon Equipment actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule items. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

288.    Papillon Equipment's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Kogan and Akopyan operate Papillon Equipment, insofar as Papillon Equipment is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Papillon Equipment to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Kogan and Akopyan continue to attempt collection on the fraudulent billing submitted by Papillon Equipment to the present day.

289.     Papillon Equipment is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Papillon Equipment in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

290.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $145,000.00 pursuant to the fraudulent bills submitted through Papillon Equipment.

291.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Kogan, Akopyan, and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

292.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 304 of this Complaint as if fully set forth at length herein.

293.     Papillon Equipment is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

294.     Kogan, Akopyan, and John Doe Defendants 1-10 are owners of, employed by, or associated with the Papillon Equipment enterprise.

295.     Kogan, Akopyan, and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Papillon Equipment's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Papillon Equipment was not eligible to receive under the New York No-Fault

Laws because: (i) Papillon Equipment billed for Fraudulent Equipment that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care and/or medically necessity; (ii) Papillon Equipment submitted bills to GEICO for Fraudulent Equipment were the result of unlawful, collusive, kickback financial arrangements; (iii) the Fraudulent Equipment was purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iv) to the extent that Papillon Equipment actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the Fee Schedule items actually provided; and (v) to the extent that Papillon Equipment actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule items. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

296.    Kogan, Akopyan, and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

297.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $145,000.00 pursuant to the fraudulent bills submitted through Papillon Equipment.

298.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Papillon Equipment, Kogan, and Akopyan
### (Common Law Fraud)

299.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 304 of this Complaint as if fully set forth at length herein.

300.    Papillon Equipment, Kogan, and Akopyan intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

301.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were issued pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care and/or medically necessity; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were obtained by the Defendants as a result of unlawful financial arrangements; (iii) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fee Schedule items accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact Fee Schedule items did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, the charges for Non-Fee

Schedule items contained in the bills to GEICO misrepresented the permissible reimbursement amount.

302.    Papillon Equipment, Kogan, and Akopyan intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Papillon Equipment that were not compensable under the No-Fault Laws.

303.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $145,000.00 pursuant to the fraudulent bills submitted by the Defendants through Papillon Equipment.

304.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

305.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Papillon Equipment, Kogan, and Akopyan**
**(Unjust Enrichment)**

306.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

307.    When GEICO paid the bills and charges submitted by or on behalf of Papillon Equipment for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

308.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper,

unlawful, and unjust billing scheme.

309.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

310.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $145,000.00.

**SIXTH CAUSE OF ACTION**
**Against Kogan and Sardjoe**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

311.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 304 of this Complaint as if fully set forth at length herein.

312.     Lament Supply is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

313.     Kogan and Sardjoe knowingly conducted and/or participated, directly or indirectly, in the conduct of Lament Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for approximately one year seeking payments that Lament Supply was not eligible to receive under the New York No-Fault Laws because: (i) Lament Supply billed for Fraudulent Equipment that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care and/or medically necessity; (ii) Lament Supply submitted bills to GEICO for Fraudulent Equipment were the result of unlawful, collusive, kickback financial arrangements; (iii) the Fraudulent Equipment was purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iv) to the extent that Lament

Supply actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the Fee Schedule items actually provided; and (v) to the extent that Lament Supply actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule items. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

314.    Lament Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Kogan and Sardjoe operate Lament Supply, insofar as Lament Supply is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Lament Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Kogan and Sardjoe continue to attempt collection on the fraudulent billing submitted by Lament Supply to the present day.

315.    Lament Supply is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Lament Supply in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

316.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $244,000.00 pursuant to the fraudulent bills submitted through Lament Supply.

317.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Kogan, Sardjoe, and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

318.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 304 of this Complaint as if fully set forth at length herein.

319.    Lament Supply is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

320.    Kogan, Sardjoe, and John Doe Defendants 1-10 are owners of, employed by, or associated with the Lament Supply enterprise.

321.    Kogan, Sardjoe, and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Lament Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Lament Supply was not eligible to receive under the New York No-Fault Laws because: (i) Lament Supply billed for Fraudulent Equipment that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care and/or medically necessity; (ii) Lament Supply submitted bills to GEICO for Fraudulent Equipment were the result of unlawful, collusive, kickback financial arrangements; (iii) the Fraudulent Equipment was purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iv) to the extent that Lament Supply actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the Fee

Schedule items actually provided; and (v) to the extent that Lament Supply actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Non-Fee Schedule items. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

322.    Kogan, Sardjoe, and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

323.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $244,000.00 pursuant to the fraudulent bills submitted through Lament Supply.

324.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Lament Supply, Kogan, and Sardjoe**
**(Common Law Fraud)**

325.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 304 of this Complaint as if fully set forth at length herein.

326.    Lament Supply, Kogan, and Sardjoe intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

327. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were issued pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care and/or medically necessity; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were obtained by the Defendants as a result of unlawful financial arrangements; (iii) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fee Schedule items accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when in fact Fee Schedule items did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, the charges for Non-Fee Schedule items contained in the bills to GEICO misrepresented the permissible reimbursement amount.

328. Lament Supply, Kogan, and Sardjoe intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Lament Supply that were not compensable under the No-Fault Laws.

329. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $244,000.00 pursuant to the fraudulent bills submitted by the Defendants through Lament Supply.

330.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

331.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Lament Supply, Kogan, and Sardjoe
### (Unjust Enrichment)

332.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 304 of this Complaint as if fully set forth at length herein.

333.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

334.    When GEICO paid the bills and charges submitted by or on behalf of Lament Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

335.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

336.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

337.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $244,000.00.

## JURY DEMAND

338.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.     On the First Cause of Action against Papillon Equipment and Lament Supply, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Papillon Equipment and Lament Supply have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Kogan and Akopyan, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $145,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Kogan, Akopyan, and John Doe Defendants 1-10, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $145,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Papillon Equipment, Kogan, and Akopyan, for compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $145,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Papillon Equipment, Kogan, and Akopyan, for compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $145,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Kogan and Sardjoe, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $244,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Kogan, Sardjoe, and John Doe Defendants 1-10, for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $244,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Lament Supply, Kogan, and Sardjoe, for compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $244,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper; and

I.      On the Ninth Cause of Action against Lament Supply, Kogan, and Sardjoe, for compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $244,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper.

Dated: Uniondale, New York
       June 7, 2024

RIVKIN RADLER LLP

By:   */s/  Michael A. Sirignano*
        Barry I. Levy (BL 2190)
        Michael A. Sirignano (MS 5263)
        Joshua D. Smith (JS 3989)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*